UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL GARBOWSKI, ET AL,           )
    Plaintiffs,                     )
                                    )
           v.                   )     C.A. No. 16-cv-11963-MLW
                                    )
TOKAI PHARMACEUTICALS, INC., ET AL,)
    Defendants.                     )


VAIBHAV DOSHI, ET AL,               )
    Plaintiffs,                     )
                                    )
           v.                   )     C.A. No. 16-cv-11992-MLW
                                    )
TOKAI PHARMACEUTICALS, INC., ET AL,)
    Defendants.                     )


MEMORANDUM AND ORDER

WOLF, D.J.                                    March 16, 2018

    In these consolidated class actions, it is alleged that Tokai

Pharmaceuticals, Inc. and several of its officers, directors, and

underwriters committed securities fraud in connection with the

development of galeterone, an experimental drug. On September 30,

2016, Steven Maxon and Sanjiv Purohit timely filed competing

motions, pursuant to the Private Securities Litigation Reform Act

of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3), seeking consolidation,

appointment as lead plaintiff for the class, and approval of their

respective selections of lead counsel. Maxon is a contractor for

the United States Department of Defense who is working in Djibouti.

Purohit subsequently withdrew his motion because Maxon has a larger

financial stake in the litigation. However, Purohit stated that he intended the withdrawal to have "no impact on...his ability to serve as a representative party should the need arise." C.A. No. 16-11992, Docket No. 51.

As explained in this Memorandum, a purpose of the PSLRA is to assure that securities class actions will be directed by lead plaintiffs who are willing and able to select and supervise class counsel. It was intended to end the perceived practice of counsel choosing plaintiffs, operating without supervision, and often profiting greatly from settlements that provided little benefit to class members.

On September 28 and October 10, 2017, the court held hearings concerning Maxon's motion, which raised questions regarding his suitability to serve as a lead plaintiff and the suitability of Pomerantz LLP ("Pomerantz") to serve as lead counsel. Among other things, although Maxon had previously certified under oath that he had read the complaint, he informed the court that he did not know what a complaint was and had not read anything except a notice on a website before seeking to become lead plaintiff. In addition, although he said he may have spoken to another law firm, Maxon did not know that Pomerantz had filed the motion seeking his appointment as lead plaintiff and selection of it as class counsel until the court expressed its intention to question him. He did not hear from or speak to anyone at Pomerantz until just before

the September 28, 2017 hearing in which Maxon attempted to participate by telephone from the United Arab Emirates.

On October 10, 2017, the court ordered that Maxon and the law firms seeking to represent him provide additional information. On October 17, 2017, Maxon filed a notice that he was withdrawing his motion. Pomerantz proposes that the court reopen the period for class members to apply to be appointed lead plaintiff.

For the reasons explained below, the court is denying Pomerantz's request to reopen the period for class members to seek to become lead plaintiff. Although other courts have reopened the period after the withdrawal of a lead plaintiff, it is not clear that the PSLRA grants the authority to do so. In any event, the plaintiffs who filed these cases and Purohit are now eligible to be considered for appointment. Because of the filing of multiple cases, other class members had 103 days--much longer than the 60 days ordinarily provided by the PSLRA--to seek appointment. No institutional investor expressed interest. Nor has any institutional or individual investor expressed interest in becoming lead plaintiff in the five months since Maxon withdrew his motion. Reopening the notice period would further delay the progress of the case, which defendants have a legitimate interest in having resolved as promptly as possible. In these circumstances, assuming that the court has the authority, it is not necessary or

appropriate to reopen the period for additional class members to move for appointment as lead plaintiff.

It is appropriate to provide Purohit an opportunity to renew his request. In addition, the plaintiffs in each case are also eligible to be considered for appointment as lead plaintiff. Therefore, Purohit and each plaintiff are being ordered to file, by April 20, 2018, a motion for appointment in the form required by the PSLRA or a statement that he does not seek to serve as lead plaintiff.

To provide guidance to potential lead plaintiffs in this case and their counsel, the court is explaining why it would have found Maxon and Pomerantz to be inadequate as lead plaintiff and class counsel respectively.

## I. APPLICABLE LAW

Before the enactment of the PSLRA, "[c]ourts traditionally appoint[ed] lead plaintiff and lead counsel in class action lawsuits on a first come first serve basis." S. Rep. No. 104-98 (1995)(reprinted in U.S.C.C.A.N. 679)(the "Senate Report"). "This encouraged a 'race to the courthouse' among parties seeking lead-plaintiff status." In re Cendant Corp. Litig., 182 F.R.D. 144, 145 (D.N.J. 1998).

The previous system also "spawned a cottage-industry of specialized securities litigation firms that 'researched potential targets for these suits, enlisted plaintiffs, controlled the

litigation, and often negotiated settlements that resulted in huge profits for the law firms with only marginal recovery for the shareholders.'" Id. "Investors in the class usually ha[d] great difficulty exercising any meaningful direction over the case brought on their behalf" and "[t]he lawyers c[ould] decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients." Senate Report at 6. "[P]laintiffs' counsel in many instances litigate[d] with a view toward ensuring payment for their services without sufficient regard to whether their clients [were] receiving adequate compensation in light of evidence of wrongdoing." Id.

Section 101(b) of the PSLRA, codified at 15 U.S.C. §74u-4, now governs the appointment of lead plaintiffs in securities class actions. As Judge Patti Saris succinctly explained, that section recognizes that "the selection of the lead plaintiff and lead counsel should rest on considerations other than how quickly a plaintiff has filed its complaint." In re Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d 39, 43 (D. Mass. 2001)(Saris, D.J.). The PSLRA aims:

> "to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the most adequate plaintiff." [H.R. Conf. Rep. No. 104-369 ("House Conference Report") at] 33-34 [1995]. This is predicated upon the conclusion that "[i]nstitutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more

5

effectively than class members with small amounts at stake." Id. at 34. Expressing a jaundiced view of "unsupervised" plaintiffs' attorneys, the [House] Conference Committee was most hopeful that "the plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff." Id. at 35.

Id.; see also Arkansas Teacher Retirement System v. Insulet Corp., 177 F. Supp. 3d 618, 621 (D. Mass. 2016)(Wolf, D.J.). In essence, the PSLRA aims "to empower investors so that they--not their lawyers--exercise primary control over private securities litigation." Senate Report at 4.

To achieve those goals, §101(b) establishes a process to "locate a person or entity, whose sophistication and interest in the litigation are sufficient to permit that person or entity to function as an active agent for the class" and "actively supervise the conduct of the litigation" of class actions alleging securities fraud. In re Cendant Corp. Litig., 264 F.3d 201, 266-67 (3d Cir. 2001)(Becker, J.). It requires that "not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class--

(I)     of the pendency of the action, the claims asserted therein, and the purported class period; and

(II)    that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class."

6

15 U.S.C. §77u-4(a)(3)(A)(i).

"Each plaintiff seeking to serve as a representative party on behalf of a class [must] provide a sworn certification," "which [must] be personally signed by such plaintiff and filed with the complaint, that:

(i)     states that the plaintiff has reviewed the complaint and authorized its filing;

(ii)    states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;

(iii)   states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

(iv)    sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;

(v)     identifies any other action under [the Securities Act], filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and

(vi)    states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court..."

15 U.S.C. §78u-4(a)(2)(A).

Subsection (a)(3)(B)(i) & (ii) require that "no later than 90 days" after the notice is published, or as soon as practicable

after the court renders a decision on a motion to consolidate related class actions:

> the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") in accordance with this subparagraph.

(emphasis added). "The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." Id. at §78u-4(a)(3)(B)(v).

For the purposes of §77u-4(a)(3)(B)(i), "the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this subchapter is the person or group of persons that:

> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class;[1] and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."

---

[1] In considering who has the largest financial stake in the litigation, courts have considered "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period." Arkansas Teachers, 177 F. Supp. 3d at 622 (citing representative cases).

Id. at §77u-4(a)(3)(B)(iii)(I). "The presumption...may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff:

> (aa) will not fairly and adequately protect the interests of the class; or
>
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class."

Id. at (iii)(II).

"The [initial] determination of whether the movant with the largest interest in the case 'otherwise satisfies' Rule 23 should be confined to determining whether the movant has made a prima facie showing of typicality and adequacy." In re Cendant Corp., 264 F.3d at 263. This determination "should be a product of the court's independent judgment." Id. "[I]n inquiring whether the movant has preliminarily satisfied the typicality requirement, [courts] should consider whether the circumstances of the movant with the largest losses are markedly different or the legal theory upon which the claims [of that movant] are based differs from that upon which the claims of other class members will perforce be based." Id. at 265. In assessing adequacy at this stage, the court must also consider whether the proposed lead plaintiff "has the ability and incentive to represent the claims of the class vigorously, [whether he] has obtained adequate counsel, and

[whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." Id.

In exercising its judgment, the court should consider "the substantive policies of [the PSLRA]," which, as indicated earlier, are to ensure that "securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." Berger v. Compaq Computer Corp., 257 F. 3d 475, 483 (5th Cir. 2001). Under the PSLRA, "one of a lead plaintiff's most important functions is to 'select and retain' lead counsel." In re Cendant Corp., 264 F. 3d at 265 (quoting 15 U.S.C. §78u-4(a)(3)(B)(v)). In addition, as also indicated earlier, "active and able" representatives must be able to ensure that counsel do not "litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation in light of evidence of wrongdoing." Senate Report at 6; see also In re Cendant Corp., 264 F. 3d at 255.

"One of the best ways" for a court to ensure that a proposed lead plaintiff will fulfill these functions is:

> to inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel. Thus, a court might conclude that the movant with the largest losses could not surmount the threshold adequacy inquiry if it lacked legal experience or sophistication, intended to select as lead counsel a firm that was plainly incapable of undertaking the

representation, or had negotiated a clearly unreasonable fee agreement with its chosen counsel.

Id. at 265-66. The question, however, is not "whether another movant may have chosen better lawyers or negotiated a better fee agreement," but "whether the choices made by the movant with the largest losses are so deficient as to demonstrate that [he] will not fairly and adequately represent the interests of the class, thus disqualifying [him] from serving as lead plaintiff at all." Id.

Whether the proposed lead plaintiff diligently negotiated a fee agreement is especially important because the court, when approving any request for attorney's fees, will presume that the lead plaintiff's fee agreement is one that "a fully informed client would negotiate" and is, therefore, reasonable. See id. at 282.

II. PROCEDURAL HISTORY

On August 1, 2016, Pomerantz, on behalf of plaintiff Vaibhav Doshi, filed a class action complaint against Tokai and certain of its officers and directors in the United States District Court for the Southern District of New York. The complaint alleges securities fraud in connection with the development of the company's galeterone drug. Doshi asserts claims under the Securities and Exchange Act of 1934 (the "Exchange Act"), §§10(b) and 20(a). The action was subsequently transferred to the District of

Massachusetts as Doshi v. Tokai Pharmaceuticals, Inc. et al., C.A. No. 16-11992 (the "Doshi Action").

Also on August 1, 2016, Pomerantz, among other law firms, published a notice announcing the filing of the Doshi Action. See Declaration of Matthew L. Tuccillo, Ex. A. The notice advised investors of their right to file a motion to be appointed lead plaintiff in the Doshi Action within 60 days, meaning by September 30, 2016. See id.

On September 29, 2016, Michael Garbowski and Stephen Bushansky filed a similar action. See C.A. No. 16-11963-MLW (the "Garbowski Action"). They allege the same claims as Doshi under §10(b) of the Exchange Act and also assert claims under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), codified at 15 U.S.C. §§77k, 77l(a)(2), and 77o.[2]

On September 30, 2016, Purohit and Maxon each moved to be appointed lead plaintiff. See Docket Nos. 7 & 8 ("Maxon's First Motion"); Doshi Action, Docket Nos. 18 & 19 ("Purohit's Motion"). Maxon's motion represented that he had purchased 28,620 shares of Tokai securities and suffered a loss of $390,105 in connection with purchases he made during the class period. See Maxon's First

---

[2] Other related actions are Wu v. Tokai Pharmas., C.A. No. 16-12550 (the "Wu Action") and Angelos v. Tokai Pharmas., 17-11365 (the "Angelos Action"). The Angelos Action has been consolidated with these cases for pretrial purposes only.

Motion at 11-12; Lieberman Decl., Ex. C. Purohit represented that he had acquired 1,720 shares and lost $8,386.76 in connection with those purchases. See Purohit Motion, Ex. 3. Purohit later withdrew his motion because Maxon had a larger financial stake in the litigation. See Doshi Action, Docket No. 51. However, as noted earlier, Purohit stated that he intended the withdrawal to have "no impact on...his ability to serve as a representative party should the need arise." Id.

On October 14, 2016, however, Garbowski and Bushansky opposed Maxon's motion to be appointed lead plaintiff, arguing that it was premature. In particular, they asserted that the previously-published notices to the class had concerned only the Doshi Action. The Doshi Action alleged only claims under the Exchange Act on behalf of a class of investors who purchased Tokai securities in the 13 months between June 24, 2015 and July 25, 2016. In contrast, the Garbowski Action alleged claims under both the Securities Act and the Exchange Act based on a longer class period--the 22 months between September 17, 2014, the date of Tokai's initial public offering, and July 25, 2016. As indicated earlier, the PSLRA requires that the notice set forth "the claims asserted" in the action and "the purported [class] period." 15 U.S.C. §77u-4(a)(3)(A)(i). Notice of the Garbowski Action was not published until October 14, 2016. See Opp. to Maxon's First Motion, Ex. A (Docket No. 24-1). Therefore, Garbowski and Buchansky

13

requested that any decision on Maxon's motion to be appointed lead plaintiff be deferred for 60 days, until December 13, 2016.

Maintaining that the August 1, 2016 notice was adequate and that the deadline for moving to be appointed lead plaintiff was September 30, 2016, Maxon nevertheless filed a new motion for consolidation and appointment as lead plaintiff, with Pomerantz as lead counsel, on December 13, 2016. See Docket Nos. 28 & 29 ("Maxon's Second Motion") at 3.

Both of Maxon's motions raised questions concerning whether Maxon is a suitable lead plaintiff. In particular, as explained earlier, the PSLRA requires prospective lead plaintiffs to submit a sworn certification stating, among other things, "that the plaintiff has reviewed the complaint and authorized its filing," and listing "all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. §78u-4(a)(2)(A)(iv). With both of his motions, Maxon submitted a Plaintiff's Certification which appeared to be electronically signed by him. See Declaration of Jeremy Lieberman, Ex. B (Docket No. 30-2)(the "Certification"). The Certification stated that "plaintiff's transactions in the security that is the subject of the complaint during the class period specified in the complaint are as follows: (see attached)." Id. at ¶4. The words "(see attached)" appeared within a solid black box. Id. A document entitled "List of

14

Purchases and Sales" was attached. Id. at 3. It was unclear to the court, however, whether the black box was a subsequent redaction and whether the list had been attached to the Certification when Maxon signed it.

In any event, the Certification and Maxon's other submissions did not provide sufficient information for the court to decide whether Maxon satisfied all of the PSLRA's requirements for serving as lead plaintiff, as set forth in In re Cendant Corp., 264 F. 3d at 263-67 and more recently by this court in Arkansas Teachers, 177 F. Supp. 3d at 622-23. In particular, the memorandum accompanying the motion stated that Maxon was an adequate class representative because: (1) he had the largest financial interest in the litigation between the two movants; (2) his claims were typical; and (3) with respect to the adequacy requirement of Rule 23, (a) there was "no antagonism" between his interests and those of the class" and (b) he "has retained counsel highly experienced in...prosecuting securities class actions..." Docket No. 22 at 14; Docket No. 29 at 18. However, the memorandum did not address whether Maxon was willing and able "to represent the claims of the class vigorously," including by managing the litigation and the lawyers. In re Cendant Corp., 264 F.3d at 265-66; see also Arkansas Teacher, 177 F. Supp. 3d at 623. It was not accompanied by a declaration explaining whether Maxon had "negotiate[d] a reasonable retainer agreement with that counsel," among other

things relevant to assessing his adequacy to serve as lead plaintiff. In re Cendant Corp., 264 F.3d at 263-65.[3]

Therefore, on September 28, 2017, the court attempted to hold a hearing concerning Maxon's motions.[4] Maxon participated briefly by telephone from the United Arab Emirates. Jeffrey Lieberman, Esq. of Pomerantz represented Maxon, and addressed some of the court's questions. Mr. Lieberman stated that Maxon first contacted Goldberg P.C. ("Goldberg"), and that Brian Schall, Esq. of Goldberg "vigorously [went] through [with Maxon] the requirements of being a lead plaintiff and what is entailed." Sept. 28, 2017 Tr. (Docket No. 78) at 71. Mr. Lieberman represented that Pomerantz told Maxon that his duties were "to oversee counsel, which is very important, to make sure that we are doing our job in representing the class, to maximize recovery in this case for all investors," and to testify in the United States when required. Id. Mr. Lieberman stated that those requirements had been "explained

---

[3] The memorandum, in support of Purohit's motion, by the Rosen Law Firm, P.A., also did not address whether Purohit understood a lead plaintiff's duties or had negotiated a fee agreement. See Doshi Action, Docket No. 19 at 5-6.

[4] At the September 28, 2017 hearing, the court also heard defendants' motions to consolidate these cases with the Angelos Action and the Wu Action, and Wu's motion to remand her case to state court. The court consolidated the Garbowski and Doshi Actions for all purposes, and the Angelos action for pretrial purposes. See Garbowski Action, Sept. 28, 2017 Order at ¶¶1-2. It stayed the Wu Action pending a decision by the United States Supreme Court in Cyan, Inc. v. Beaver County Employees Retirement Fund, S. Ct. Case No. 15-1439. See Wu Action, Sept. 28, 2017 Order.

numerous times to Mr. Maxon" and offered to submit a declaration by Maxon "confirm[ing] what he understands his duties to be[.]" Id. at 74-75.

In response to an inquiry from the court, Mr. Lieberman also stated that Maxon had not yet negotiated a fee agreement with Pomerantz. See id. at 76-77. Instead, Mr. Lieberman explained, Maxon "asked how fees worked, and we explained to him how generally it applies." Id. at 76. According to Mr. Lieberman, Maxon was aware that "we will not seek a fee above 30 percent." Id.

Maxon, however, was no longer connected to the hearing by telephone when the court attempted to question him concerning whether he would be a suitable lead plaintiff. Therefore, the court could not then determine whether Maxon understood the responsibilities of a lead plaintiff and whether he was competent to discharge them.

Accordingly, the court denied the motion to appoint Mr. Maxon as lead plaintiff without prejudice. See Sept. 28, 2017 Order (Docket No. 80) at ¶4. Maxon and Mr. Schall were ordered to file additional declarations addressing whether Maxon understood and satisfied all of the requirements of a lead plaintiff in a class action under the PSLRA. Id. at ¶¶5-6. Another hearing on Maxon's motion was scheduled for October 10, 2017, to be conducted by teleconference because Maxon would be at his regular place of business in Djibouti. On September 28, 2017, despite assuming Maxon

already had it, the court directed that Pomerantz give Maxon a copy of the Certification submitted with his motions so that he could respond to questions about it. See id. at 81.

Maxon and Mr. Schall filed the required declarations. See Docket No. 84. Mr. Schall's declaration stated that he had communicated with Maxon by telephone "on at least two occasions" before Pomerantz filed Maxon's First Motion, including on July 27, 2016, "for approximately one and a half total hours" and advised him of the duties of a lead plaintiff. See Oct. 5, 2017 Decl. (Docket No. 84-2) at ¶4. In a subsequent declaration, Mr. Schall revised this statement, stating that he spoke to Maxon at least once before September 26, 2016, and is uncertain about whether he spoke to Maxon on July 27, 2016. See Oct. 25, 2017 Aff. (Docket No. 98) at ¶¶7, 12. Mr. Schall also stated that Maxon has "contacted [him] regularly" since Maxon's First Motion was filed. See Oct. 5, 2017 Decl. at ¶6.

Maxon's declaration stated that he "underst[ood] and appreciat[ed] the lead plaintiff's obligation under the PSLRA to select lead counsel and to monitor the action to ensure that it is prosecuted efficiently." Oct. 5, 2017 Decl. (Docket No. 84-1), at ¶5. He believed he had "fulfilled this responsibility by selecting and retaining" Pomerantz, which has "substantial experience in achieving substantial recoveries in securities class actions." Id. He stated that he had "signed a retainer agreement with Pomerantz

pursuant to which Pomerantz will not request a fee in excess of 30% of any settlement or judgment achieved." Id. at ¶6. Finally, he stated that he would "continue to supervise counsel and actively oversee the prosecution of the action for the benefit of the class by, among other things, reviewing pleadings, instructing counsel, sitting for depositions, and/or attending hearings, as necessary." Id. at ¶7. He also stated that he had "numerous" communications by telephone and email with Mr. Schall "and/or" Alexander Hood, Esq. of Pomerantz.

At the October 10, 2017 hearing, the court questioned Maxon and Mr. Schall. Maxon stated that he saw Goldberg's notice concerning this litigation and contacted the firm by filling out a form on a website. See Oct. 10, 2017 Tr. (Docket No. 89) at 10, 27, 37. However, it is unclear whether that form was the Certification submitted to the court with Maxon's motions. Maxon stated that his attorneys sent the Certification to him on the morning of the hearing, October 10, 2017, at the direction of the court. Id. at 21-22. He had no memory of seeing it before and did not remember signing it. Id. at 27-28. Instead, he testified that he completed a form stating that Goldberg "would represent [him] and that [he] wasn't dealing with any other firms." Id. at 12, 28-29. When asked about the statement in the Certification that he had "reviewed the complaint and authorized its filing," Maxon stated that he had not read anything before signing the document

on the website and did not know what a complaint was. Id. at 20. He testified that the "List of Purchases and Sales" reflected information he obtained from Merrill Lynch and sent to Mr. Schall around September 26, 2016. Id. at 24-25. Therefore, it could not have been attached to any form he signed on August 3, 2016. See id.

Maxon also testified that he communicated with Mr. Schall by email starting in August 2016. Id. at 30-31. He stated that he did not have any oral conversations with any lawyer regarding this case except for Mr. Hood. Id. at 31, 34-35. Maxon said he first spoke with Mr. Hood after the court ordered that Maxon participate in the September 28, 2017 hearing, shortly before that hearing began. Id. at 32-35. He also stated that Mr. Hood, not Mr. Schall, explained the responsibilities of a lead plaintiff to him. Id. at 33-34. Maxon understood those responsibilities to be "to represent the people involved in this litigation to the best that I can do as far as judgment is concerned," to "look at everyone's interests," to testify truthfully, and to attend hearings in the United States if requested. Id. at 34. Maxon did not mention the obligations to select competent class counsel, to negotiate a reasonable retainer agreement with that counsel, or to actively supervise the conduct of the litigation and the actions of class counsel. See In re Cendant Corp., 264 F. 3d at 265, 267.

Maxon testified that he had a second, 10 to 15 minute conversation with Mr. Hood before the October 10, 2017 hearing. See Oct. 10, 2017 Tr. at 35-36. During that call, Mr. Hood sent Maxon two documents: Maxon's October 5, 2017 declaration and an attorney's fee agreement, both of which Mr. Hood had drafted. Id. at 38. Mr. Hood told Maxon he should sign and return both. Id. at 36, 74-75. Maxon did so the following day. Id. at 37.

Maxon stated several times that he never had any oral conversation with Mr. Schall. Id. at 50-51. Mr. Schall, however, reiterated his belief that he had extensive telephone conversations with Maxon before the motion for his appointment as lead plaintiff was filed. Id. at 52.

The court orally ordered that, by October 17, 2017, Mr. Schall file the telephone records of his conversations with Maxon and inform the court of the dates of those calls. Id. at 64. The court also ordered Mr. Schall to file, on October 10, 2017, a supplemental declaration concerning when he first received Maxon's "Plaintiff's Certification" (Docket No. 30-2), and providing his copy of it. Id. at 61.

On October 10, 2017, Mr. Schall filed the Certification and related declaration. See Oct. 10, 2017 Decl. & Exhibit (Docket Nos. 88 & 88-1). These filings resolved some questions, but raised others. Mr. Schall stated that he first received the Certification on or after August 3, 2016 from Lundin Law P.C. See Oct. 10, 2017

21

Decl. (Docket No. 88-1) at ¶¶3-4. He stated that Maxon had submitted the Certification through Lundin Law's website, that Maxon subsequently informed Mr. Schall by telephone that he wished to retain Goldberg as counsel, and that Lundin authorized Mr. Schall to retrieve the Certification from the website. Id. at ¶4.

The Certification attached to Mr. Schall's October 10, 2017 declaration is identical to the Certification previously filed with Maxon's motions, except that paragraph four of the October 10, 2017 submission contains, in place of the black box, a list of purchases and sales of securities. Oct. 10, 2017 Schall Decl., Ex. A. Mr. Schall stated that "[t]he page following [the Certification previously filed with Maxon's motions] reflects the same transaction history initially submitted by Mr. Maxon at paragraph 4 of his [original] Certification," which was the version filed on October 10, 2017. Id. at ¶8.

However, the "List of Purchases and Sales" following the Certification filed with Maxon's motions on September 30 and December 13, 2016, Docket Nos. 9-2 & 30-2, is different from the list contained in paragraph 4 of the original form filed in the October 10, 2017 submission. First, the document filed with Maxon's motions does not list his July 26, 2015, post-class-period sales of 28,620 shares of Tokai securities.[5] Those sales are listed in

---

[5] Pomerantz may have omitted the July 26, 2015 sales from the document filed with Maxon's motions because they occurred after

the October 10, 2017 submission. The Certification filed with the motions also lists two purchases of 2,857 and 10,000 shares of Tokai stock, respectively, as having occurred on December 22, 2015, instead of on December 28, 2015 as listed in the October 10, 2017 submission. Compare Docket No. 30-2 at 3 with Docket No. 88-1 at ¶4.

As indicated earlier, on October 17, 2017, Mr. Lieberman filed a Notice of Withdrawal of Motion of Steven Maxon for Appointment as Lead Plaintiff and Approval of Counsel (the "Notice") (Docket No. 91). The Notice requests that the court order a "modified re-opening of the PSLRA lead plaintiff appointment process" by ordering that another notice be published and providing 30 more days for class members to seek appointment as lead plaintiff. Id. at 2.

Mr. Schall, however, did not comply with the order that he file by October 17, 2017 the telephone records of his conversations with Maxon and a declaration concerning the dates of those calls. On October 23, 2017, the court issued an Order explaining that the

the class period ended. The certifications and attached list only purport to list transactions within the class period. However, the discrepancies make the Certification Pomerantz filed with Maxon's motions an incomplete and inaccurate representation of the statements in Maxon's original certification. It was not, therefore, a "true and correct" copy of that certification, as Mr. Lieberman represented in his declaration accompanying the submission, Docket No. 30.

Withdrawal Notice did not relieve Mr. Schall of the obligation to file those items. It also ordered Mr. Lieberman to file Mr. Maxon's fee agreement with Pomerantz.[6]

On October 24, 2017, Mr. Lieberman filed the fee agreement, reflected in a letter from Pomerantz to Maxon dated October 3, 2017. As stated in Maxon's declaration, but not in his October 10, 2017 testimony, the agreement states that Pomerantz will not seek a fee in an amount greater than 30% of any settlement or judgment. Though not mentioned in the prior submissions, the agreement also provides that Pomerantz may recover "costs necessary for the prosecution of this case...from any such recovery." Docket No. 93-1 at 3. This indicates that Maxon was authorizing Pomerantz to seek more than 30% of the total settlement fund--that is, 30% in attorneys' fees, plus an additional portion to cover Pomerantz's expenses.

On October 25, 2017, Mr. Schall filed another declaration and several attachments, including a record of the dates, times, originating and destination cities, and durations of his calls between May 21 and November 1, 2016. See Oct. 25, 2015 Aff. (Docket No. 98). In his declaration, Mr. Schall stated that he was "nearly certain that [he] talked to Mr. Maxon on the phone," but that he

---

[6] As explained in the October 23, 2017 Order, the court inadvertently failed at the October 10, 2017 hearing to order that the agreement be filed.

had "not yet located [his] telephone calls with Mr. Maxon on [the] phone records." Id. at ¶2. He stated that he "believe[s] the reason for this misunderstanding is due to the fact that certain calls from military bases and calls from prepaid calling cards are not reflected on the Verizon bill." Id. He confirmed this fact with two Verizon representatives. Id. As evidence that he had telephone conversations with Maxon, he submitted an October 10, 2017 email from Maxon to Pomerantz in which Maxon stated that he had "forgot about the calls from the Goldberg firm." Id. Ex. D. Mr. Schall also gave detailed descriptions of the contents of telephone calls with Mr. Maxon, see id. at ¶3, and stated that Mr. Hood informed him that while preparing for the October 10, 2017 hearing, Maxon told Mr. Hood that he remembered talking to Mr. Schall on the telephone. See id. at ¶9.

### III. MAXON'S MOTION TO BE APPOINTED LEAD PLAINTIFF

Although Maxon has withdrawn his motion for lead plaintiff, the court is giving the parties guidance concerning how it would have applied the PLSRA and Rule 23 standards to Maxon's motion to be appointed lead plaintiff to minimize the risk of problems in the future. The court may have to decide a motion by Purohit, Garbowski, Buchansky, and/or Doshi to be appointed lead plaintiff in these consolidated actions. However, as indicated earlier, Pomerantz's memorandum on behalf of Maxon, and Rosen's memorandum on behalf of Purohit, did not sufficiently address the standards

applicable to determining whether the movants would be "adequate" lead plaintiffs. Any future motions for appointment as lead plaintiff should comport with the court's guidance.

Despite the absence of a record, the court is satisfied that Mr. Schall spoke to Maxon on the telephone at least once. However, the fact that Maxon did not recall any conversation with him or what was discussed called Maxon's ability to supervise this litigation into serious question. See Oct. 10, 2017 Tr. at 67.

More importantly, as indicated earlier, neither the conversations with Messrs. Schall and Hood nor the statements of this court succeeded in educating Maxon to understand his obligations to: (1) "select competent class counsel," to (2) "to negotiate a reasonable retainer agreement with that counsel," and to (3) "actively supervise the conduct of the litigation and the actions of [that] counsel." In re Cendant Corp., 264 F. 3d at 265, 267. Therefore, the court is not satisfied that he would have been willing or able to discharge those duties. Id.

Maxon's testimony regarding his fee agreement with Pmomarantz illustrates the reasons for the court's conclusion that Maxon would not have been an adequate lead plaintiff. As explained earlier, "one of a lead plaintiff's most important functions is to 'select and retain' lead counsel." Id. (citing 15 U.S.C. §78u-4(a)(3)(B)(v)). Accordingly, "one of the best ways for a court to ensure that it will fairly and adequately represent the interests

of the class is to inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable retainer agreement with that counsel." Id. This ensures that "the plaintiff will choose counsel rather than...counsel choosing the plaintiff," House Conference Report at 35, and that the lawyers do not "litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation," Senate Report at 6.

In this case, Maxon did not select Pomerantz. Instead, Maxon testified that less than one week after the close of the proposed class period, when Tokai announced that it was discontinuing the phase three trial of galeterone, Maxon committed to working only with Goldberg. See Oct. 10, 2017 Tr. at 12, 28. Goldberg later selected Pomerantz. It is permissible for outside counsel to "help the class representative in carrying out its role as such and in overseeing proposed class counsel." Feder v. Electronic Data Systems Corp., 429 F. 3d 125, 132 (5th Cir. 2005). Goldberg, however, did not "help" Maxon select Pomerantz. Rather, Maxon stated that Goldberg "handed [Maxon] off" to Pomerantz without his knowledge or approval. Oct. 10, 2017 Tr. at 44-45. Maxon never heard of Pomerantz until "a few days before [his] first phone conversation" with the court on September 28, 2017, when he "was contacted by Mr. Hood." Id. Mr. Hood informed Maxon that Mr. Hood

27

"would be the lawyer that would be running the meetings with [the court] and that [Maxon] was to talk to him...directly since he was in New York." Id. This was one year after Pomerantz filed the motion to appoint Maxon lead plaintiff and Pomerantz as class counsel.

Maxon also made no attempt to negotiate for the class to receive a higher percentage of the recovery than Pomerantz proposed. Id. at 40 In response to a question from the court about whether he had negotiations with Mr. Hood about what the fee would be, Maxon responded, "No, none whatsoever." Id. Pomerantz filed the motion to appoint Maxon lead plaintiff and Pomerantz as class counsel in September 2016. However, there was no fee agreement until the court asked Mr. Lieberman whether there was one. Subsequently, in a fifteen-minute conversation, Mr. Hood told Maxon that "he would be sending [Maxon] two documents," Maxon's declaration and the fee agreement, and that Maxon "needed to sign them and then scan and e-mail them back to him..." Id. at 37. Maxon asked no questions and made no counteroffer. Rather, he signed the letter as drafted and e-mailed it back the following day. Id. He never spoke to any law firm other than Goldberg and Pomerantz. In addition, he stated that no one discussed the fee with him before he signed the agreement, which he described as "a standard agreement from a law firm." Id. at 41-42. Mr. Hood confirmed that "no one at the Pomerantz firm to my knowledge had direct

communications with Mr. Maxon about the [fee] agreement prior to" the week preceding the October 10, 2017 hearing. See id. at 76.

Maxon stated that no negotiation concerning fees was needed because he believed that 30% of the recovery was a reasonable fee, based on a suit he brought as an individual "quite a while ago" in New York and "research" about a class action involving Exxon Mobil. Id. at 20-21, 40. However, Maxon's further answers indicated that he did not carefully review or understand the agreement sent to him by Mr. Hood. For example, Maxon incorrectly believed that although "the law firm usually gets 30% of the settlement," Pomerantz could "get all the money" "if the settlement for the share price was low and [Pomerantz's] hourly rates ate up the rest of the money." Id. at 41. However, under the proposed agreement, Pomerantz would not have been entitled to seek compensation above 30% of the recovery plus costs necessary for the prosecution of the case.

In addition, as explained earlier, the resulting fee agreement provides that Pomerantz is authorized to seek more than 30% of the settlement fund in attorneys' fees and expenses. Negotiations by an adequate representative might, for example, have resulted in a concession by Pomerantz to pay its expenses from any fee award of 30%, rather than charging the expenses to the class fund. They could have also persuaded Pomerantz to lower its fee.

Finally, Maxon's testimony regarding the Certification filed with his motions in September and December 2016 raises questions concerning the reliability of representations made by Maxon and Pomerantz. As explained earlier, Docket No. 30-2 was not a "true and accurate cop[y]...of the Shareholder Certification executed by Maxon (redacted to exclude Mr. Maxon's personal identifying information)," as Pomerantz represented it to be on September 30 and December 13, 2016. See Sept. 30, 2016 Tuccillo Decl. at ¶2; Dec. 13, 2016 Lieberman Decl. at ¶2. The form certified that a list of Maxon's transactions in Tokai securities was attached, when in fact the list was attached only after Maxon signed the form. In addition, the attachment did not accurately and completely reflect the transactions that Maxon had originally included in his signed Certification.[7]

Moreover, on August 3, 2016, Maxon signed, under oath, a "Plaintiff's Certification," which stated in paragraph 1, "Plaintiff [meaning Maxon] has reviewed the complaint and authorized its filing." Docket No. 30-2. As explained earlier, such a certification is required to be filed with a PSLRA class

---

[7] If Pomerantz believed that the July 26, 2017 sales Maxon listed on the original form were irrelevant because they were made after the close of the class period, it could have left the information unredacted, attached the List of Purchases and Sales in a separate exhibit, and explained that the July 26, 2017 sales were outside the class period. In any event, it should not have filed the documents in a manner that misrepresented the contents of the Certification.

action complaint. See 15 U.S.C. §78u-4(a)(2)(A)(i). However, Maxon repeatedly testified that he did not known what a complaint was or the name of the document that initiates a lawsuit. See Oct. 10, 2017 Tr. at 18-20. He also testified that he did not read anything before signing the Certification under oath except for something on a website that instructed him that he had to sign the document "in order to go forward with the class action lawsuit." Id. at 18; see also id. at 20. It is evident that Maxon had not, on August 3, 2016, read the complaints filed on behalf of Garbowski, Buchansky, or Doshi. Nor did Maxon later read any amended complaint to be filed on his behalf or authorize its filing.

Maxon's willingness to make false statements under oath contributes to the court's conclusion that he would not have been an adequate lead plaintiff. The willingness of Pomerantz to submit to the court a statement that was obviously incorrect at least to the extent that it represented that Maxon had authorized the filing of a complaint heightens the court's concerns. Its failure to speak to Maxon about whether he had read any of the complaints in these actions or anything else before submitting Maxon's misrepresentation to the court, reinforces the conclusion that Maxon, with Pomerantz as his counsel, would not have represented the putative class in the manner required by the PSLRA.

More specifically, the court would have found that Maxon did not understand the obligations of a lead plaintiff, and would not

have been willing and able to satisfy them. As explained earlier, he did not select proposed class counsel or negotiate their fee. No one at Pomerantz ever spoke to Maxon, or communicated with him directly, until the court expressed its intent to question him at the September 28, 2017 hearing. Therefore, the court concludes that if Maxon and Pomerantz had been appointed, this case would have been conducted by unsupervised plaintiffs' attorneys--a practice the PLSRA was intended to end. See House Conf. Report at 35; Berger, 257 F. 3d at 483; Lernout, 138 F. Supp. 2d at 43; Arkansas Teachers, 177 F. Supp. 3d at 621.

IV.  REQUEST TO REOPEN THE LEAD PLAINTIFF APPLICATION PERIOD

Pomerantz requests that the court authorize it to issue a new notice inviting class members other than the plaintiffs and Purohit to move within 30 days for appointment as lead plaintiff. As explained earlier, in enacting the PSLRA lead plaintiff provision, Congress intended put the investor "most capable of adequately representing the interests of class members" in charge of the case. 15 U.S.C. §77u-4(a)(3)(B)(i). However, by establishing deadlines for motions for lead plaintiff and directing that the court consider any such motion promptly, the PSLRA also aims "to ensure that the lead plaintiff is appointed at the earliest possible time, and to expedite the lead plaintiff process." Coopersmith v. Lehman Brothers, Inc., 344 F. Supp. 2d 783, 793 (D. Mass. 2004)(Gorton, D.J.).

Although some courts have reopened the application period after a lead plaintiff has withdrawn, see, e.g., In re Neopharm Sec. Litig., 2004 U.S. Dist. LEXIS 5814 (N.D. Ill. 2004), it is not clear whether the PSLRA authorizes reopening. In any event, new notice is not required to be published when movants withdraw their motions for lead plaintiff because "the PSLRA does not limit lead plaintiffs to those who have filed motions within 60 days of the publication of the notice. Rather, those presumed most adequate to serve as lead plaintiffs include either those who have filed a complaint or those who made a motion for appointment within the 60 day period." Coopersmith, 344 F. Supp. 2d at 790. Therefore, "[w]here there is not a timely motion before the Court, the PSLRA directs [the] Court's attention to the plaintiffs that have 'filed [a] complaint.'" Id. at 791 (quoting Skwortz v. Crayfish Co., Ltd., 2001 WL 1160745, at *5 (S.D.N.Y. 2001)).

This case includes class action complaints that were filed by Garbowski, Buchansky, and Doshi. They are still each eligible to request appointment as lead plaintiff. In addition, Purohit withdrew his motion to be appointed lead plaintiff in deference to Maxon, who had a larger financial stake in the litigation. It would, therefore, be appropriate to consider whether Purohit would be an adequate lead plaintiff if he is now willing to serve.

It is, however, neither necessary nor appropriate to issue a new 30-day notice inviting others to seek to represent the class.

It is not necessary because Purohit and each of the original plaintiffs is a potential lead plaintiff if he wishes to seek to serve. It is not appropriate because the filing of multiple cases resulted in 103 days, more than the usual 60 days, for individuals or institutions to consider whether to try to become lead plaintiff. No institutional investor expressed interest. There is no reason to believe that a new notice would produce an institutional lead plaintiff.[8] Indeed, neither an institutional investor nor anyone else has expressed interest in becoming lead plaintiff in the five months since Maxon withdrew his motion.

The PLSRA process is intended to produce a lead plaintiff within 90 days after notice of the filing of a class action suit or promptly after multiple related class actions are consolidated. See 15 U.S.C. §78u-4(a)(3)(B)(i) & (ii). Reopening the notice period would further delay the progress of this case, which the court expects will include the filing of a consolidated amended complaint by anyone appointed lead plaintiff and a motion to dismiss. Defendants have a legitimate interest in knowing as soon

---

[8] At the September 28, 2017 hearing Mr. Lieberman stated that institutional investors rarely choose to participate in pharmaceutical class actions. See Sept. 28, 2017 Tr. at 75. Therefore, he said, "it's very common to have a non-institutional investor [as lead plaintiff] in a pharmaceutical case, particularly where it is focused on one product [as in this case]." Id.

as now possible whether this case will continue as a putative class action and the allegations against each of them.

Therefore, the court is ordering that, by April 20, 2018, Garbowski, Buchansky, Doshi, and Purohit move, individually or as one or more groups, for appointment as lead plaintiff or state that they decline to do so. If one or more of these eligible individuals moves to be appointed lead plaintiff, the court will promptly conduct a hearing to determine whether his motion is meritorious and to resolve any competing claims to the position.

V.   ORDER

1.   Garbowski, Buchansky, Doshi, and Purohit shall each, by April 20, 2018, either:  (a) move, individually or as a group, to be appointed lead plaintiff and propose class counsel; or (b) state that he does not seek to serve as lead plaintiff. If they wish to apply for appointment as a group, they shall address the factors discussed in In re Cendant Corp., 264 F. 3d at 266-67.

2.   A hearing shall be held on April 30, 2018, at 2:00 p.m. Any person seeking to serve as lead plaintiff shall attend and be prepared to testify if necessary.


UNITED STATES DISTRICT JUDGE